## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

CATHY AKERS,

    Plaintiff,

v.              ACTION NO. 4:17cv89

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

    Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

  Plaintiff, Cathy Akers ("Akers"), brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying Akers' claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, as well as her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. §§ 401–34.

  An order of reference assigned this matter to the undersigned. ECF No. 8. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Akers' motion for summary judgment (ECF No. 11) be **DENIED** and that the Commissioner's motion for summary judgment (ECF No. 13) be **GRANTED**.

# I.    PROCEDURAL BACKGROUND

Plaintiff, Cathy Akers, protectively filed applications for DIB and SSI on January 28, 2013, and February 5, 2013, respectively, alleging that she became disabled on June 2, 2010, due to depression, chronic obstructive pulmonary disease ("COPD"), obesity, degenerative disc disease, arthritis, back pain, and possible fibromyalgia.[1]  R. 14, 210–28, 309.  The SSA denied her applications initially on November 6, 2013, R. 151–55, and upon reconsideration on July 15, 2014, R. 160–70.  Following the state agency's denial of these claims, Akers requested a hearing before an Administrative Law Judge ("ALJ").  R. 172–74.  ALJ William T. Vest, Jr., held a hearing on February 10, 2016, and took testimony from Akers (represented by counsel) and an impartial vocational expert.  R. 31–52.  On February 26, 2016, the ALJ denied Akers' claim for benefits, finding that she was not disabled from July 8, 2011[2] through the date of the decision. R. 8–30.

On May 25, 2017, the Appeals Council denied Akers' request for review of the ALJ's decision.   R. 1–4.   Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.  Having exhausted all administrative remedies, Akers filed a complaint with this Court on July 24, 2017.  ECF No. 3.  The Commissioner answered on September 29, 2017.  ECF No. 7.  In response to the Court's order, the parties filed motions for summary judgment, with supporting memoranda, on November 15, 2017 and December 15, 2017,

---

[1] Page citations are to the administrative record that the Commissioner previously filed with the Court.

[2] Akers had filed a prior application for a period of disability benefits that was denied at the reconsideration level on July 7, 2011, and not appealed.  R. 11, 305.  Accordingly, the ALJ found that Akers' claim of disability through July 7, 2011 was barred by *res judicata*.  R. 11.  Akers does not challenge this determination.

respectively.  ECF Nos. 11–14.  As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

## I.   RELEVANT FACTUAL BACKGROUND

### A.  *Background Information and Hearing Testimony by Cathy Akers*

Born in 1967, Akers was 48 years old as of the date of the ALJ's decision.  R. 210.  She has a seventh grade education and has not completed a GED program.  R. 40, 310.  Akers has past work experience as a bus driver, a bus aide, and a stocker.  R. 49.  She was last employed in 2009 as a bus driver, but was laid off.  R. 34–35.  She continued to look for work for some time after that, but has not looked for work in several years.  *Id.*

She testified that she lives with her adult daughter and her ex-husband, who assist her with paying her bills and taking care of the house.  R. 35–38.  Her husband had been in prison since 2013 for embezzlement.[3]  R. 35, 38.  She visits her husband about once each month, which is a three or three and one-half hour drive.  R. 44.  Her mother drives her on those trips, and she requires stops due to her back pain.  R. 44–45.  Her daughter's six-year old son also lives in the home and Akers cares for him occasionally in the afternoons.  R. 37.

She testified that she takes muscle relaxers and hydrocodone pills for her back, ProAir and medication similar to Spiriva for her COPD, and meloxicam for her arthritis.  R. 36.  Her arthritis affects her shoulders, wrists, back, and hip.  R. 37.  She experiences pain in her lower back on the right side and in her shoulders.  R. 39.  Her pain medication gives her some relief, but she must lie down for additional relief.  *Id.*  She testified that the muscle relaxers and hydrocodone make her very sleepy such that she has to lie down.  R. 41.  She lies down for three or four hours "[j]ust about" every day.  R. 41–42.  She testified that she spends most of her day

---

[3] Akers testified at the hearing that he was to be released in October 2016.  R. 38.

3

watching television or laying down.  R. 43–44.

She also testified that her medication negatively impacts her ability to focus and concentrate.  R. 42.  She stated that she has difficulty following complex written or verbal instructions.  R. 45–46.  She gets distracted by noise.  R. 46.  She stated that her depression sometimes causes her not to want to do anything but lay in bed and sleep.  R. 47.  She spends two or three days per week isolated in her room due to her depression.  *Id.*

She testified that she can do some light vacuuming and some cleaning, but that she cannot bend over too much.  R. 37.  She occasionally drives, but does not own a car.  R. 38.  She can dress, bath, and otherwise take care of herself without assistance.  *Id.*  She stated that she has problems standing for a period of time and can only walk at a slow pace, and only for around 350 feet, before needing to sit and rest.  *Id.*  She testified that she can stay seated for an hour or an hour and a half.  R. 39.  She occasionally goes grocery shopping, and usually uses the motorized carts.  R. 43.  She stated that she can lift a gallon of milk, but that it hurts to lift anything heavier.  *Id.*

As of the hearing, Akers was five feet, six inches tall and weighed 326 pounds.  R. 36.  She testified that she has attempted exercise, but that her back pain prevents her from doing so often.  R. 44, 48.  She can reach overhead with her right arm, but not with her left arm.  R. 48.  She does not lift objects over her head.  *Id.*

In an adult function report dated April 1, 2013, Akers noted that she tries to do house work, but has to take breaks due to back pain.  R. 323, 332.  She spends most of her time sitting.  R. 323.  She does not sleep well at night and usually stays up until 2 or 3 a.m., before getting up at 11 a.m. or 12 p.m.  *Id.*  She takes care of four dogs, putting food in their bowls and letting them outside.  R. 326, 512.  She checked the box indicating that she has "no problem" with

personal care, but did note that she gets out of breath and has to take breaks. R. 326. She prepares meals daily, but must take breaks on account of back pain. R. 327. She cleans "a little," does laundry, and loads the dishwasher "sometimes," but does not do yard work due to back pain and depression. R. 327–28. Sometimes she needs assistance doing such chores. *Id.* At home, she listens to audiobooks, sews, and watches television. R. 329. She has to change positions and lay down after a while when doing these activities. *Id.*

She does not go outside very often, generally due to outside temperature, but does go outside to sit if it is nice. R. 328. She noted she can go out alone for short trips and drive herself. *Id.* When she does leave the house, it is mostly to shop for food, which she does every few weeks. *Id.* Socially, she receives visitors, and visits others "[o]n good days." R. 329. Due to her depression, she sometimes does not want to be around other people. R. 330. She noted that her back and neck hurt most of the time, and that she can walk for 10 or 15 minutes before needing to stop and rest for 5 or 10 minutes. *Id.*

She noted she can follow written instructions if they are easy to understand, and can sometimes follow spoken instructions, which may need to be repeated. *Id.* She handles stress poorly, but generally handles changes in routine "ok." R. 331. To sum up, she noted that she hurts all the time, has good days and bad days, but that her bad days are more frequent than her good days. R. 332.

## B.  Relevant Medical Evidence

### 1.  Akers' Physical Examinations

The record contains very little evidence of medical treatment from July 7, 2011, the start of the relevant period, until January 28, 2013. On that date, Akers presented to Daniel Muench, M.D., complaining of depression, GERD, hypertension, and high cholesterol. R. 459. Akers

stated that she was having muscle aches and pain throughout her body, and that she was tired all the time. *Id*. Akers' physical examination was generally unremarkable. R. 460. Dr. Muench assessed Akers with myalgia, hypertension, depressive disorder, hyperlipidemia, right upper quadrant pain, and chronic cough. *Id*. He prescribed Coazaar and Celexa. *Id*. Akers followed up on April 29, 2013. R. 457. She stated that she does not watch her diet, exercise, or check her blood pressure at home, and "cannot tell a difference" to her symptoms when taking Celexa. *Id*. She stated she was fatigued daily. *Id*. Again, her physical examination was normal. R. 458. She was assessed with hypertension, chronic cough, COPD, and hyperlipidemia. *Id*. She was advised to seek counseling, due to major life changes as a result of her husband's incarceration, and follow-up in six months. *Id*.

Akers saw Monique Sessler, M.D., on October 15, 2013, complaining of chronic obstructive lung disease, chronic back pain, and osteoarthritis affecting her shoulders, back, and left hip. R. 450. Akers stated to Dr. Sessler that she was limited in her ability for prolonged walking and standing and that her back and hip pain had increased in recent years. *Id*. She also stated that she has left shoulder problems making it difficult to reach and do overhead movements. *Id*. In terms of presentation, Akers ambulated slowly without the use of a cane or other assistive devices. R. 451. She showed discomfort when transitioning from lying down to sitting or standing, and when standing for a prolonged period. *Id*. She had tenderness and decreased range of motion in her left shoulder. *Id*. She had tenderness in her upper lumbar, lower thoracic, and mid-back, and decreased range of motion. *Id*. She had normal range of motion in her left hip, with some stated discomfort. *Id*. Ultimately, Dr. Sessler concluded that Akers was limited in her ability to stand or walk for over a half hour, was limited in her ability to kneel, stoop, or squat, was limited in her ability to sit for more than two hours, and was unable to

do upward-reaching movements. R. 451–52. She had a limited ability to do moderate activities due to shortness of breath. *Id.*

On October 18, 2013, state agency physician Joyce Goldsmith, M.D., issued a residual functional capacity assessment. R. 93–95. Dr. Goldsmith opined that Akers could lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently, could stand and/or walk for 4 hours in a an 8-hour workday, and could sit for 6 hours in an 8-hour workday. R. 93. Dr. Goldsmith also opined that Akers' "statements appear[ed] to be partially credible and not fully supported by the evidence in file." R. 95. On July 8, 2014, another state agency physician, Karen Sarpolis, M.D., issued a residual functional capacity assessment, which concurred with Dr. Goldsmith's assessment of Akers' exertional limitations. R. 109–112. Dr. Sarpolis also opined that Akers was able to perform her activities of daily living with some limitations due to pain. R. 112.

On November 4, 2013, she followed up with Dr. Muench as previously instructed. R. 463. Dr. Muench assessed back pain, hypertension, hyperlipidemia, and depression, and added Wellbutrin to her medications. R. 464. On January 29, 2014, she saw neurosurgeon Brian Cameron, M.D., complaining of neck pain. R. 489. She described her pain as ranging from 3/10 to 5/10 in severity. R. 490. She denied trouble balancing or walking. *Id.* Dr. Cameron ordered x-rays and a cervical MRI, R. 491, which revealed a focal left paracentral disc herniation without evidence of neural foraminal narrowing and minimal degenerative disc disease at C5-C6. R. 471.

Akers returned to Dr. Muench on May 5, 2014, stating that a recent MRI had shown arthritis. R. 495. Akers' physical examination was once again unremarkable. R. 496. She had a depressed affect. *Id.* Dr. Muench assessed depression, back pain, asthma, sleep apnea,

hypertension, hyperlipidemia, and edema. *Id*. He opined that she "has a poor social situation and multiple problems, none of which by themselves are probably disabling. She will pursue disability further through her psychiatrist [first]." R. 496–97. Dr. Muench referred Akers to Joseph T. Adinaro, IV, M.D., a cardiologist with Riverside Cardiology Specialists. R. 498. Akers told Dr. Adinaro on May 22, 2014 that she was exercising at the YMCA three days a week and feeling well, but was under significant stress due to financial problems and her husband's incarceration. *Id*. Her physical examination was unremarkable. R. 499. Akers had further unremarkable physical examinations on November 23, 2015, R. 546–47, and May 18, 2015, R. 550–51.

On January 21, 2015, Akers presented to the emergency room with an acute exacerbation of back pain from standing in line for two hours at the food bank. R. 592. She had point tenderness at T12-S1, no muscle spasms, no pain with the straight leg raise, full motor strength, and normal extremities. R. 593. An x-ray showed mild degenerative spurring in the mid to lower thoracic spine, but was otherwise normal. *Id*. She was diagnosed with back pain and prescribed Flexeril. R. 594.

On July 30, 2015, Akers saw Kristyn Sayball, D.O., regarding her COPD. R. 620. Akers told Dr. Sayball that she was almost back to her baseline following six weeks of treatment for an upper respiratory infection, and that she could walk about 40 feet without having to take a break. *Id*. Akers' chest was clear to auscultation. R. 623. A pulmonary function test showed normal results. R. 627.

### 2. *Akers' Mental Examinations*

On October 23, 2013, Akers saw clinical psychologist Ronald V. Kidd, Ph.D., for a mental status examination. R. 454–56. Dr. Kidd diagnosed her with depressive disorder not

8

otherwise specified and rated her global assessment of functioning ("GAF") score at 55.[4]  R. 455. She told Dr. Kidd that she does dishes occasionally and laundry every two weeks.  R. 454.  She stated that she had dealt with depression her entire life, but was never treated as an inpatient in a psychiatric facility.  R. 454–55.  Dr. Kidd opined that Akers presented symptoms of depression in a believable manner.  R. 456.  He further opined that Akers presented as capable of carrying out routine and simple tasks, but that she may have inconsistent performance and erratic attendance on the job, to a potentially unacceptable level. *Id.*

On November 26, 2013, Akers presented to Peggy Capin, Ph.D., complaining of worsening depression and anxiety attacks.  R. 512–13.  Akers reported that her depression and anxiety were exacerbated by the stress and financial problems caused by her husband's embezzlement and incarceration.  R. 512.  She stated that her daughter and grandson live with her and that she cares for her grandchildren on a daily basis.[5]  *Id.*  He ex-husband had moved in and was paying half of the rent, and her daughter was paying the other half.  *Id.*  She was stressed by her children, grandchildren, and ex-husband's continual demands, noise, and presence.  *Id.*  She wanted to eat all the time.  *Id.*  Dr. Capin assessed Akers with an adjustment disorder.  R. 523.

---

[4]  The GAF scale, devised by the American Psychiatric Association, ranges from zero to one hundred and indicates an overall assessment of a person's psychological, social, and occupational functioning.  Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR), 34 (4th ed. 2000).  The following ranges are linked to the following symptomology: (1) 91–100—no symptoms, superior functioning; (2) 81–90—absent or minimal symptoms, good functioning; (3) 71–80—transient symptoms, no more than slight impairment in functioning; (4) 61–70—some mild symptoms, generally functioning pretty well; (5) 51–60—moderate symptoms and moderate functional difficulties; (6) 41–50—serious symptoms and serious functional impairments; and (7) 31–40—"some impairment in reality testing or communication ... and major impairment in several areas" of functioning.  *Id.*  The DSM-V abandoned the use of GAF scores as a diagnostic tool for characterizing patient functioning due to the questionable probative value of the scores.  Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed. 2013).

[5]  It is unclear which grandchildren are referred to in this statement, other than her daughter's son.

9

Akers continued to treat with Dr. Capin until December 22, 2015.  R. 523–37, 562–71, 574–89.  On December 9, 2013, Akers stated that she walked a couple of times but quit because the weather was bad.  R. 523.  Dr. Capin discussed the possibility of going to the YMCA or walking in a large store.  *Id*.  On January 15, 2014, Aker relayed that she had been walking on non-stormy days.  R. 524.  On April 16, 2014, Dr. Capin praised Akers for starting regular YMCA attendance.  R. 531.  On June 18, 2014, Akers reported that she was exercising on the treadmill and going to the YMCA.  R. 535.  On June 25, 2014, Akers stated that boils made walking and treadmill exercise uncomfortable.  R. 536.  On July 23, 2014, Akers and Dr. Capin discussed ways of getting Akers moving again and managing her depression.  R. 564.  On September 24, 2014, Akers stated that she was no longer going to the YMCA because she could not afford to do so, but that she was walking outside and doing some activities in the yard.  R. 566.  On May 6, 2015, she reported getting out in the yard and working on projects in the house she had not done for a long time.  R. 583.  She reported being generally more active, happy, and engaged with her family.  *Id*.  On July 29, 2015, she stated that she was continuing activity around the house and yard, but that she could not afford to go to the YMCA.  R. 587

On December 9, 2013, Akers stated that her daughter had nobody to help her (presumably with Akers' grandchildren), so Akers had to help her.  R. 523.  On March 12, 2014, Akers stated she had been working on a meditation map project and was working in the yard because the weather was nice.  R. 529.  On several occasions, Akers discussed working on projects, such as making pincushions she could sell, making Christmas gifts for her grandchildren, or making banners to hang at church.  R. 532, 536, 574, 575.  She reported that working on these projects helped keep her mind from negative thoughts.  R. 575.  On July 1, 2015, Akers reported that she was caring for her ex-husband, who had been in a car accident, and

was doing "lots of child care." R. 585.

On March 5, 2014, Akers and Dr. Capin discussed the benefits of more activity leading to more energy, and Dr. Capin challenged Akers to consider seeking part-time employment. R. 528. They again discussed the possibility and value of part-time work on numerous other occasions. R. 530, 535, 536. On December 17, 2014, she reported that she was seeking employment with a co-op. R. 571.

Akers and Dr. Capin frequently discussed stressors related to Akers' husband's incarceration. R. 524, 526, 531. On July 16, 2014, Akers reported that her husband had been relocated to a prison nearly four hours away. R. 563. She visited him there on numerous occasions. R. 564, 566, 571, 574, 579, 587. On May 7, 2014, Akers reported that she was stressed, that any noise could cause her to "snap," and that she had moods when she just wanted to yell. R. 532. She cancelled numerous meetings with Dr. Capin due to stress caused from financial problems or family illnesses, R. 566–71, 580–81, because she was not feeling well, R. 578, 581, or because she had to care for her grandchild, R. 589. In addition to stress caused by her husband, she also repeatedly discussed stresses caused by her ex-husband. R. 531, 565, 569, 570, 575.

On February 8, 2014, Dr. Capin filled out a mental disorder questionnaire form. R. 500–04. She noted that Akers cares for children, goes to the YMCA, and works in the house and yard. R. 501. Under the section labelled "present daily activities," Dr. Capin opined that Akers' "most [sic] problem is not working [and] reluctance to apply for [a] job" due to fear and anxiety that she would be unable to perform the job and would get embarrassed. R. 502. Later, Dr. Capin stated that Akers has been out of work for six years and had chosen instead to care for her grandchildren. R. 503. Dr. Capin opined that Akers had been seeing some gradual improvement

in her condition, and could be expected to undergo significant improvement when her husband was released. R. 504. On July 9, 2014, Dr. Capin completed a mental medical source statement for Akers. R. 506–11. She evaluated adjustment disorder with mixed anxiety and depressed mood and assessed a GAF score of 50–55, evidencing moderate symptoms. *Id*. Dr. Capin opined that Akers' anxiety limited her mental abilities, and that Akers worried about working with other people. R. 509. She opined that Akers was limited or seriously limited in several mental abilities and aptitudes necessary for work, but that Akers was able to meet competitive standards in all areas. R. 509–10.

That same day, on July 9, 2014, state agency physician Elliott Rotman, Ph.D., prepared a report on Akers' medically determinable impairments and their severity. R. 107–08, 112–14. Dr. Rotman opined that Akers had mild restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of extended decompensation. R. 107. He opined that she was "[m]entally capable of sustaining simple work activities in a setting with limited social demands." R. 114.

### C.  *Hearing Testimony by Vocational Expert Robert Edwards*

At the hearing before the ALJ, Robert Edwards, a vocational expert ("VE"), responded to the ALJ's hypothetical questions concerning the availability of jobs for a person of Akers' age, education, and past work experience, who is capable of light work, but limited to simple, repetitive job tasks without the requirement to follow written instructions, who cannot climb, work at unprotected heights or around dangerous machinery, can only occasionally stoop or squat and cannot crawl, cannot perform work overhead, and cannot be exposed to excessive air pollutants. R. 49–50. VE Edwards testified that jobs in the light and unskilled level of work

existed in the national economy for a person having such a profile in the occupations of sorter, small products assembler, and cleaner or housekeeper. R. 50.

Akers' attorney then posed questions to the VE. R. 50–51. The VE testified that work would be precluded if a hypothetical person were off-task for 15% or more of the workday. R. 50. He also testified that workers are typically given 10 to 15 minute breaks in the morning and afternoon and a lunch break of 30 minutes to an hour. R. 51. Work is precluded for an individual who takes more than 30 minutes of unscheduled breaks. *Id.* He testified that a worker may miss fewer than two days per month only, and that employees may not lie down at work. *Id.*

## II.   THE ALJ'S OPINION

To evaluate Aker's claim of disability,[6] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). Specifically, the ALJ considered whether Akers: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any

---

[6] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); *accord* 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. §§ 404.1505(a), 416.905(a). A claimant seeking SSI due to a disabling condition must also establish financial need, among other requirements. *See* 42 U.S.C. § 1383.

substantial gainful employment.  R. 12–24.

The ALJ found that Akers met the insured requirements[7] of the Social Security Act through December 31, 2015, and she had not engaged in substantial gainful activity since July 8, 2011, the day after her prior Title II reconsideration denial.  R. 13–14.

At steps two and three, the ALJ found that Akers had the following severe impairments: (a) asthma by history; (b) depression; (c) anxiety; (d) degenerative disc disease; (e) arthritis; (f) chronic obstructive pulmonary disease; and (g) obesity.  R. 14.  The ALJ classified any additional impairments as non-severe, because they did not exist for a continuous period of 12 months, were responsive to medication or did not require significant medical treatment, or did not otherwise continuously impose functional limitations.  *Id.*  The ALJ further determined that Akers' severe impairments, either singly or in combination (along with her other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three.  R. 14–17.

The ALJ next found that Akers possessed the RFC to perform light work, *see* 20 C.F.R. §§ 404.1567(b), 416.967(b), subject to the limitations that she:  (a) "cannot perform any climbing"; (b) "cannot work at unprotected heights or around dangerous machinery"; (c) can perform only occasional stooping and squatting"; (d) "cannot perform any crawling"; (e) "cannot perform any work overhead"; (f) "cannot have exposure to excessive amounts of dust, smoke, or other air pollutants"; (g) "can perform simple and repetitive job tasks"; and (h) "cannot be required to follow written job instructions."  R. 18–22.  Based upon this RFC assessment, the ALJ determined at step four that Akers could not return to her past relevant work as a bus driver,

---

[7] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act.  *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

a bus aide, or a stocker.  R. 22.

Finally, at step five, and after considering her age, high school education, work experience, and RFC, the ALJ found that Akers could perform other jobs, such as a sorter, small products assembler, and a cleaner/housekeeper, which existed in significant numbers in the national economy.  R. 22–23.  Accordingly, the ALJ concluded that Akers was not disabled from July 8, 2011 through the date of the ALJ's decision and was ineligible for a period of disability, DIB, or SSI benefits.  R. 23–24.

### III.   STANDARD OF REVIEW

In reviewing a decision denying benefits, this Court will "uphold the [Commissioner's] determination when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance of evidence. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  The Commissioner's findings as to any fact, if supported by

substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate when either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## IV.    ANALYSIS

In her memorandum in support of summary judgment, Akers contends that the ALJ erred in his credibility determination, and that the reasons he gave for finding Akers only partially credible were not supported by substantial evidence. ECF No. 12 at 5–9. In assessing a claimant's credibility, an ALJ must engage in the two-step inquiry detailed in 20 C.F.R. § 404.1529 by evaluating: (1) whether an underlying medically determinable impairment was established by objective medical evidence that could reasonably be expected to produce a claimant's symptoms, and (2) if so, the extent to which such symptoms limited a claimant's functioning and ability to work, based upon their intensity, persistence, and limiting effects. *See Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017); *Craig*, 76 F.3d at 593–95. At the second step, the ALJ must "assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866 (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). The ALJ must consider all the evidence in the record when evaluating the intensity and persistence of a claimant's symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c). This evidence includes the objective medical evidence, the claimant's daily activities, various attributes of any asserted pain, such as intensity, location, and frequency, any events giving rise to symptoms, medical treatments and medications and their effectiveness, any other pain relief

measures, and other factors about the claimant's functional limitations and restrictions due to

pain. *Id.* The ALJ must not discount a claimant's subjective evidence of pain intensity based

solely upon objective medical findings. *Lewis*, 858 F.3d at 866 (citations omitted).

> With respect to Akers' credibility, the ALJ stated:

> In terms of the claimant's alleged impairments, the undersigned finds that the claimant is not fully credible (only partially credible). The claimant presented in no distress at the hearing, and the claimant was well spoken at the hearing (hearing observations). The claimant was laid off as a bus driver in 2009, and the claimant looked for work thereafter (hearing testimony). The claimant's activities of daily living are extensive (Exhibit 12E and hearing testimony). The claimant takes care of her grandson in the afternoons occasionally (hearing testimony). The claimant complains of low back pain, shoulder pain, and left hip pain; however, the claimant experiences pain relief with medications (hearing testimony). Furthermore, the claimant's depression appears to be situational, especially because the claimant's husband is incarcerated (Exhibit 6F, Exhibit 11F, and hearing testimony). Therefore, the undersigned finds that the claimant has the residual functional capacity to perform limited light work (mentioned above).

R. 21.

Akers primarily objects to the ALJ's statement that Akers' "activities of daily living are

extensive."[8] ECF No. 12 at 6, R. 21. Akers' objection to this statement is two-fold: (1) the ALJ

never specified the activities of daily living to which he referred, and (2) substantial evidence

does not support a finding of extensive activities of daily living. ECF No. 12 at 6–9.

First, Akers misrepresents the extent of the ALJ's discussion. In making his step-three

determination, the ALJ found that Akers has mild restrictions in her activities of daily living. R.

16. He then referenced her April 1, 2013 adult function report, noting that she cares for her pets,

---

[8] Akers also objects to the ALJ's statement that Akers looked for work after being laid off as a bus driver in 2009, because that period of time predates the alleged onset date of disability. ECF No. 12 at 6, R. 21. Whether this is a legitimate reason to doubt Akers' credibility or not, the ALJ presented other substantial evidence supporting his credibility determination, as discussed in this opinion. Further, there is some evidence in the record that Akers sought employment during the disability period. *E.g.*, R. 571.

has no problems with her personal care, does not need special reminders, can prepare some meals, does household chores, can go out alone, drives, goes shopping, listens to audio books, watches television, and spends time with others. *Id.* Later in his opinion, the ALJ stated that:

> Regarding her activities of daily living, the claimant testified at the hearing that she does housework; she washes dishes, with breaks; she vacuums; she watches television; she takes care of her grandson in the afternoons occasionally; she drives; she shops; she dresses herself; and she bathes herself (hearing testimony). Overall, the claimant has described daily activities that are not limited to the extent that one would expect, given the claimant's complaints of disabling symptoms and limitations.

R. 19. Thus, the assertion that the ALJ did not actually discuss any of Akers' activities of daily living is incorrect.

Akers relies on *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015) and *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656 (4th Cir. 2017) for the proposition that the ALJ must show his or her work. ECF No. 12 at 8–9. Neither is availing here. In *Mascio*, the ALJ found that the claimant's allegation was "less credible." *Mascio*, 780 F.3d at 638. The Fourth Circuit held that the ALJ erred in not explaining whether the ALJ found that claimant to be only partially credible or completely incredible. *Id.* The ALJ committed no such error here, where he clearly explained that he found Akers to be "not fully credible (only partially credible)." R. 19, 21. *Mascio's* other holding with respect to an ALJ's credibility determination is that the ALJ cannot formulate the RFC first, and then use the RFC to support a credibility determination. *Mascio*, 780 F.3d at 639. In particular, *Mascio* criticized common ALJ boilerplate, which stated that "claimant's statements . . . are not credible to the extent they are inconsistent with the above [RFC]." *Id.* The Fourth Circuit stated that such analysis "gets things backwards." *Id.* (internal quotation omitted). By contrast, in this case, the ALJ stated that he found Akers not fully credible, not because of his previously rendered RFC, but because of the evidence in the record that he

discussed in detail.  R. 19, 21.  The Court is not left to guess at the ALJ's decision-making, and Akers' reliance on *Mascio* is misplaced.

In *Patterson*, the ALJ failed, as conceded by the SSA, to follow the "special technique" for evaluating mental limitations as outlined in 20 C.F.R. § 404.1520a.  846 F.3d at 657–58.  The ALJ followed that technique in this case.  R. 16–17.  The Fourth Circuit did admonish future ALJs to "show your work," *Patterson*, 846 F.3d at 663, but the ALJ adequately did so here, where he clearly outlined the activities of daily living upon which he based his decision.  Unlike the ALJ in *Patterson*, there is no allegation that the ALJ in this case failed to follow applicable regulations.

While the ALJ did not reiterate during his credibility discussion which activities of daily living he had considered,[9] he did discuss in detail these activities at step three of his analysis and the ALJ's entire discussion is sufficiently clear as to which activities he had in mind when he wrote "[t]he claimant's activities of daily living are extensive."  R. 21.  *See Willis ex rel. J.C. v. Astrue*, No. 5:11cv71, 2012 WL 3240042, at *5–6 (W.D. Va. Aug. 7, 2012) (upholding the ALJ's decision as supported by substantial evidence even though he did not "identify the relevant listed impairments" at step three because "the record clearly demonstrate[d] his consideration of the appropriate issues"); *Crockett v. Astrue*, No. 2:10cv64, 2011 WL 2148815, at *10 (W.D. Va. June 1, 2011) (upholding the ALJ's decision as supported by substantial evidence despite not explicitly stating the reasons that the claimant's impairment did not equal a listed impairment because "read as a whole, the ALJ's decision establishe[d] that the appropriate

---

[9] After discussing in some detail Akers' activities of daily living, the ALJ stated that "[o]verall, the claimant has described daily activities that are not limited to the extent that one would expect, given the claimant's complaints of disabling symptoms and limitations."  R. 19.  While the ALJ made this statement during the step-three determination, it makes it abundantly clear to the Court that the ALJ used the activities discussed in that section to determine Akers' credibility.

factors were considered").

Second, substantial evidence supports the ALJ's decision.  The activities of daily living which the ALJ cited in his opinion find support in Akers' hearing testimony and in her adult function report.  In *Gross v. Heckler*, the Fourth Circuit stated that "the pattern of Gross' daily activity suggests that he was not disabled from working.  [Among other activities,] Gross could and did cook, wash dishes, and generally take care of a house . . . Gross went grocery shopping and took care of his own personal needs."  785 F.2d 1163, 1166 (4th Cir. 1986).  Akers is engaged in similar daily activities here.  Both her function report and her hearing testimony reflect that she can take care of her personal needs, can drive herself, and goes grocery shopping. R. 38, 43, 326, 328.  Both sources support that she cooks for herself, washes dishes, and does housework, albeit with some discomfort and necessary breaks.  R. 37, 327–28.  She also cares for her four dogs, R. 326, 512, and spends time with others, R. 329.

In addition to these activities of daily living from Akers' hearing testimony and her function report, the Commissioner's brief suggests that Akers' activities are even more robust than Akers admitted in those two sources.  ECF No. 14 at 16–17.  Indeed, many of Akers' medical records support the Commissioner's contention. *See, e.g.*, R. 512–13 (Akers stating to Dr. Capin in 2013 that she cares for her grandchildren on a daily basis); R. 529, 566, 587 (Akers stating to Dr. Capin in 2013, 2014, and 2015 that she had been doing yard work because the weather was nice); R. 532–35 (Akers stating to Dr. Capin in 2014 that she had been going to the YMCA); R. 583 (Akers stating to Dr. Capin in 2015 that she was getting out into the yard, working on projects in the house, was generally more active and happy, and was engaged with her family and playing videogames); R. 585 (Akers stating to Dr. Capin in 2015 that she was engaged in "lots of child care" and was helping to care for her ex-husband who had been in a car

accident).   Viewing the evidence as a whole, statements made by Akers to Dr. Capin, her treating psychologist, reveal an overall more extensive account of daily activity than Akers admitted in her hearing testimony.

Akers asserts that "every mental health professional that actually examined Ms. Akers that rendered an opinion on whether she can work supported her claim," ECF No. 12 at 4.  The mental health professionals Akers chooses to focus on are Drs. Capin, Sessler, and Kidd.  *See* ECF No. 12 at 4, 8.  The ALJ gave "little weight" to these doctors' opinions, finding them unsupported by the evidence of record as a whole.  R. 21.  Akers does not specifically challenge the weight given to these doctors, but instead attempts to use these doctors' opinions to demonstrate that the ALJ's credibility determination was erroneous.  ECF No. 12 at 4, 8.  While Drs. Sessler and Kidd, each of whom examined Akers on one occasion, do lend some support to her claims, the two doctors whom Akers treated with most, Drs. Capin and Muench, provide less support.  Dr. Capin opined that Akers' major problem was in not working and a reluctance to apply for a job.  R. 502.  She also stated that Akers was choosing to care for her grandchildren rather than look for work.  R. 503.  Finally, Dr. Capin opined that Akers' condition was likely to get significantly better when her husband's incarceration ended.  R. 504.  While Dr. Capin's mental medical source statement did note some limitations or serious limitations in several areas, Dr. Capin opined that Akers was not precluded from any ability or aptitude necessary for work. R. 509–11.  Dr. Capin even suggested in several sessions that Akers would benefit from seeking employment.  *See* R. 528, 530, 535, 536.

Dr. Muench, who was Akers' primary care physician for her physical ailments, opined in 2014 that Akers "has a poor social situation and multiple problems, none of which by themselves

21

are probably disabling.  She will pursue disability further through her psychiatrist [first]."[10]  R. 496–97.  The state agency physicians who examined Akers' file, Drs. Goldsmith, Sarpolis, and Rotman, also provide little support for Akers' claims.  Drs. Goldsmith and Sarpolis opined that Akers could stand and/or walk for 4 hours in a normal workday and sit for 6 hours in a normal workday, and that Akers appeared to be partially credible and made statements not fully supported by the evidence.  R. 93, 109.  Dr. Rotman opined that Akers had only mild impairments in her activities of daily living and that she was "[m]entally capable of sustaining simple work activities in a setting with limited social demands." R. 114.

Finally, the ALJ provided reasons for finding Akers only partially credible aside from those reasons to which Akers objects.  R. 21.  The ALJ noted that Akers appeared in no distress at the hearing and that her pain is at least partially relieved through medication.  *Id*.  He also noted that Akers' depression appeared to be situational, and due in large part to her husband's incarceration.  *Id*.  This statement by the ALJ is supported by Dr. Capin, who opined that Akers' condition would substantially improve upon her husband's release.  R. 504.  Viewing the evidence in the record as a whole, the ALJ clearly explained his reasons for finding Akers only partially credible, and his determination is supported by substantial evidence.

## V.    RECOMMENDATION

For the foregoing reasons, the Court recommends that plaintiff's motion for summary judgment, ECF No. 11, be **DENIED**, defendant's motion for summary, ECF No. 13, judgment be **GRANTED**, and the decision of the Commissioner be **AFFIRMED**.

---

[10] While Dr. Muench does not name the psychiatrist to which he referred, it appears likely that he was referring to Dr. Capin, whom Akers was seeing weekly at the time.  Dr. Capin is Akers' psychologist.

## VII.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
May 4, 2018

23